IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICHARD FETTEROLF,

     Plaintiff,

v.                                Case No. 2:14-CV-2172-JTM

CAROLYN W. COLVIN,
Acting Commissioner of Social Security

     Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Richard Fetterolf seeks review of a final decision by defendant, the Commissioner of Social Security, denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, respectively.  Upon review, the court finds that the Commissioner's decision was supported by substantial evidence contained in the record.  As such, the decision of the Commissioner is affirmed.

## I.      Factual and Procedural Background

Plaintiff suffers from both physical and mental health issues.  Medical records relating to his physical issues date back to April 2006 when plaintiff presented to the First Care Clinic with complaints of constant lower back pain.  An MRI of his lumbar spine showed diffuse and extensive disc herniation at the L4-L5 vertebrae causing mass effect on the dural sac and the exiting L4 nerve roots.  Plaintiff underwent several rounds of epidural injections, which he admitted relieved his pain, at least temporarily.

1

Plaintiff's medical records then jump to early 2008 when he presented with ongoing lower back pain to Dr. Frederick R. Smith.  During an evaluation, Dr. Smith observed that plaintiff could move normally and could also perform forward, backward, and side bending without discomfort.  Although plaintiff had some tenderness over his mid upper lumbar spine upon palpation, his reflexes, straight leg raise, and strength were good.  Dr. Smith diagnosed plaintiff with mechanical back pain with known degenerative disc and facet disease.  Plaintiff was ordered to physical therapy.

Because conservative treatment proved only moderately helpful, plaintiff ultimately underwent a microdiskectomy at the L4-L5 vertebrae on February 16, 2010.  Prior to surgery, plaintiff was informed that the procedure would not correct his back pain, but would rather be helpful for the radiating pain he experienced in his lower extremities.  A June 2010 MRI of plaintiff's lumbar spine showed postoperative changes on the right side associated with epidural fibrosis, mild involvement of the origin of the right L4 nerve root, mild spinal stenosis at the L3-L4 vertebrae, tiny focal central disc protrusion at the L4-L5 vertebrae, and some foraminal narrowing bilaterally.  Plaintiff underwent a second surgical procedure on July 29, 2010.

Plaintiff was still complaining of pain in September 2010, but was told that there was no reason for additional surgery.  Plaintiff again underwent epidural injections at the L4-L5 nerve root.  During a December 2010 visit with Dr. Smith, plaintiff reported that he could sit for thirty minutes, stand for twenty to thirty minutes, and walk eight to ten blocks.  His gait was normal as were his strength and reflex evaluations.  A Physical Residual Functional Capacity Assessment performed on January 19, 2011, determined that plaintiff could: (1) occasionally lift and/or carry twenty pounds, (2) frequently lift and/or carry ten pounds, (3) stand and/or walk for a total of six hours in an eight-hour day, (4) sit for a total of six hours during an eight-hour day, and (5)

engage in unlimited pushing and pulling.  Plaintiff was restricted to only occasional climbing, balancing, stooping, kneeling, crouching, and crawling.   After this assessment, plaintiff continued to complain of lower back pain and underwent several more epidural injections.

Plaintiff's mental health history dates back to January 14, 2010, when he saw nurse practitioner Joseph Mindrup at High Plains Mental Health Center.   Mr. Mindrup noted that plaintiff had previously been prescribed medications, which he was not currently taking.   On March 3, 2010, plaintiff underwent an evaluation with Sidney Vetter, MS, LCPC, and was diagnosed with major depressive disorder (recurrent, moderate), personality disorder, and attention deficit hyperactivity disorder (ADHD) not otherwise specified.   Plaintiff was also diagnosed with alcohol and cannabis abuse.

Plaintiff returned to Mr. Mindrup on April 1, 2010.  He reported that he had been off his medications since at least the beginning of March, if not late February.  Plaintiff was alert and cooperative and his memory, attention, and concentration were intact.  He denied any suicidal and/or homicidal ideation; however, Mr. Mindrup noted that plaintiff engaged in cutting (i.e. self-mutilation) approximately two weeks before the appointment. Plaintiff displayed fair insight but poor judgment.  In an appointment with Mr. Mindrup on August 10, 2010, plaintiff again reported that he had been off of his medication for a couple of months.  He also admitted that he had thoughts of cutting, but did not.  Mr. Mindrup noted that plaintiff was alert and cooperative (although he was in obvious back pain) and his memory, attention, and concentration were intact. Plaintiff denied suicidal and/or homicidal ideation.

In March 2011, plaintiff underwent an evaluation with Michael H. Schwartz, Ph.D. Plaintiff reported that his chief complaint was back pain, but stated that he also suffered from depression.  Although he mostly isolated himself at home, plaintiff admitted that he could take

care of all of his normal activities of daily living, would read, and take care of his pets.  Plaintiff stated that he had previous issues with marijuana, but had been clean for two years.  He also reported having three inpatient psychiatric stays at Larned State Hospital for depression and suicidal ideation.

Dr. Schwartz noted that plaintiff's thought processes and content seemed to reflect those of a low functioning individual, as somewhat evidenced by plaintiff's IQ testing.  Administration of the Wechsler Adult Intelligence Scale-IV resulted in a full scale IQ score of 72, determined by the following individual scores: (1) verbal comprehension, 81; (2) perceptual reasoning, 69; (3) working memory, 86; and (4) processing speed, 71.  Dr. Schwartz diagnosed plaintiff with post-traumatic stress disorder ("PTSD") (chronic, moderate), major depression (recurrent, severe), borderline intellectual functioning, and alcohol and cannabis use (in remission).  Plaintiff was also assigned a Global Assessment of Functioning ("GAF") score of fifty, indicating serious symptoms.[1]

On March 20, 2011, plaintiff was evaluated by state agency examiner Dr. Aroon Suansillppongse.  Dr. Suansillppongse found that plaintiff was able to understand, remember, and carry out simple instructions.  However, plaintiff's ability for sustained concentration, persistence, and task concentration was minimally limited due to: (1) limited intellectual functioning, (2) anxiety, (3) depressive reaction, and (4) alleged pain and hallucinatory experiences.  Likewise, plaintiff's ability for appropriate interaction with supervisors/coworkers/general public and his ability to adapt to a routine work setting were also

---

[1] The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV"), at 32.  A GAF score of 50 indicates serious impairment in reality testing or communication or major impairment in several areas such as school, work, family relations, judgment, thinking, or mood.  Id. at 34.

minimally limited.  Dr. Suansillppongse concluded that plaintiff had the capacity for simple work-related activity with infrequent contact with the public and diagnosed plaintiff with mood disorder NOS/major depression, borderline intellectual functioning, and poly-substance abuse.

Dr. Suansillppongse also administered a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. He again diagnosed plaintiff with mood disorder NOS/major depression, borderline intellectual functioning, and poly-substance abuse.  Dr. Suansillppongse concluded that plaintiff had mild restriction with regard to activities of daily living and moderate difficulties in maintaining social functioning, concentration, persistence, and pace.  Dr. Suansillppongse also reported that plaintiff had one or two episodes of decompensation.  With regard to the Mental Residual Functional Capacity Assessment, Dr. Suansillppongse found that plaintiff was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; and (8) set realistic goals or make plans independently of others.

Plaintiff returned to Mr. Mindrup twice in 2012.   In May, plaintiff reported having cut himself for pain release approximately a month and a half prior to the appointment.  Mr. Mindrup found that plaintiff was alert and cooperative, his mood and affect were good, and his memory, attention, and concentration were intact.  Plaintiff denied any suicidal and/or homicidal

ideation and was assigned a GAF score of 54, indicating moderate symptoms. Plaintiff's evaluation in June remained largely unchanged.

In September 2012, Mr. Mindrup completed a Mental Residual Functional Capacity questionnaire. He noted that plaintiff's prognosis was poor, as he struggled with a lack of consistent good mood control. Mr. Mindrup reported that plaintiff had marked restriction of activities of daily living; extreme difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and continual episodes of decompensation. Plaintiff's symptoms were expected to cause him to be absent from work for more than four days per month.

Plaintiff filed for DIB and SSI on September 28, 2010, alleging disability beginning November 30, 2007.[2] His claims were denied initially on March 31, 2011, and upon reconsideration on August 9, 2011. Plaintiff timely filed a request for an administrative hearing, which took place on September 12, 2012, before Administrative Law Judge James Harty. Plaintiff, represented by counsel, appeared and testified. Also testifying was Vocational Expert Cynthia A. Younger.

At the time of the hearing, plaintiff was forty-eight years old and resided with his twelve-year-old son, over whom he had full residential custody. Plaintiff testified that he could drive but did not have a valid driver's license due to a failure to pay parking tickets. He indicated that he received food stamps, a medical card for health insurance purposes, and additional government benefits, including subsidized housing. Plaintiff stated that he had previously suffered from a marijuana addiction, but had allegedly been clean since 2008. He also testified that he had made previous suicide attempts.

---

[2] The alleged onset date was later amended at the administrative hearing to September 24, 2010.

6

Plaintiff last worked as a trash collector for approximately seven months.  He stated that he left the position because he "couldn't take the back pain anymore and . . . started missing a lot of work."  Dkt. 11-1, at 63.  Plaintiff testified that his longest job was with La Crosse Furniture, where he worked for approximately twelve years.  When asked what prevented him from returning to work, plaintiff indicated that he could not stand for very long or bend over and had difficulty remembering things.

With regard to his mental health issues, plaintiff stated that he saw staff at High Plains every couple of months.  He indicated that he had a history of self-mutilation, was easily angered, and had frequent crying spells.  Plaintiff also testified that he had difficulty with concentration and finishing tasks.

Plaintiff also testified about his physical issues, namely his lower back pain, which he indicated had not really changed despite having two surgeries.  He stated that he could likely lift twenty pounds, stand for forty-five minutes at a time, sit for an hour, and walk one mile.  Plaintiff reported only moderate difficulty with crouching, crawling, stooping, squatting, bending, kneeling, and getting down on the floor, but did state that he would have a difficult time standing back up.  Plaintiff indicated that he could take care of his personal needs and could generally go shopping, clean, and cook, but stated that his son's mother also helped with some of these tasks.

Based upon plaintiff's testimony, as well as the administrative record as a whole, the ALJ asked the Vocational Expert a hypothetical question that included varying degrees of limitation on actions such as balancing, standing, kneeling, crouching, and crawling, as well as limitations on the individual's ability to perform repetitive tasks, work as a team, and interact with coworkers and the general public.  Based on the limitations given, the VE indicated that the

hypothetical individual could not perform plaintiff's past relevant work but could perform other work available in the national economy.  Specifically, the VE identified inserting machine operator, impression mold machine tender, and collator operator as jobs that such an individual could perform.

On cross examination, plaintiff's attorney questioned the VE as to what would happen if the hypothetical individual, assuming all of the limitations as given by the ALJ, was also unable to maintain attention and concentration for long periods of time, was off task ten to fifteen percent of the time, and was absent from work one to two days per month.  The VE indicated that there would be no other work available in the national economy for an individual with such limitations.

The ALJ issued his opinion on October 18, 2012, finding that plaintiff suffered from a variety of severe impairments, including degenerative disc disease of the lumbar spine (status post-surgery times two), ADHD, cognitive disorder NOS, borderline intellectual functioning, major depressive disorder (with and without psychotic features), bipolar disorder, PTSD, and personality disorder NOS.  Despite these findings, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ concluded that plaintiff retained the residual functional capacity to perform light work, as that term is defined under Social Security Regulations, with the following limitations and/or exceptions: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift ten pounds; (3) stand and/or walk for only six hours during an eight-hour day; (4) sit for six hours during an eight-hour day; (5) occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (6) never climb ladders, ropes, or scaffolds; (7) avoid concentrated exposure to cold

temperatures and extreme vibration; (8) only perform simple, routine, repetitive tasks that are not done in a fast-paced production environment or as an integral part of a team; (9) only perform tasks that involve simple work-related decisions and relatively few workplace changes; and (10) occasional interaction with supervisors, coworkers, and the general public. This decision became the final decision of the Commissioner on February 27, 2014, after the Appeals Council denied review.

On April 11, 2014, plaintiff filed a Complaint in the United States District Court for the District of Kansas seeking reversal and the immediate award of benefits or, in the alternative, a remand to the Commissioner for further consideration. Given Plaintiff's exhaustion of all administrative remedies, his claim is now ripe for review before this court.

## II.    Legal Standard

Judicial review of the Commissioner's decision is guided by the Social Security Act (the "Act") which provides, in part, that the "findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court must therefore determine whether the factual findings of the Commissioner are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion." *Barkley v. Astrue*, 2010 U.S. Dist. LEXIS 76220, at *3 (D. Kan. July 28, 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)). The court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.3d 799, 800 (10th Cir. 1991)).

An individual is under a disability only if he or she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months." *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)). This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *3 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002)).

Pursuant to the Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled. *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a). The steps are designed to be followed in order. If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4.

The first three steps of the sequential evaluation require the Commissioner to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those severe impairments meets or equals a designated list of impairments. *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 U.S. Dist. LEXIS 76220, at *4-5 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)). If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's residual functional capacity, which is the claimant's ability "to do physical and mental work

activities on a sustained basis despite limitations from her impairments." *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

Upon assessing the claimant's residual functional capacity, the Commissioner moves on to steps four and five, which require the Commissioner to determine whether the claimant can either perform his or her past relevant work or whether he or she can generally perform other work that exists in the national economy, respectively. *Barkley*, 2010 U.S. Dist. LEXIS 76220, at *5 (citing *Williams*, 844 F.2d at 751).  The claimant bears the burden in steps one through four to prove a disability that prevents performance of his or her past relevant work. *Lax*, 489 F.3d at 1084.  The burden then shifts to the Commissioner at step five to show that, despite his or her alleged impairments, the claimant can perform other work in the national economy. *Id*.

### III.     Analysis

Plaintiff alleges three assignments of error: (1) improper analysis in evaluating disability under Listing 12.05C, (2) improper reliance on minimal daily activities to discount credibility, and (3) failure to properly evaluate opinion evidence.

### A.     Listing 12.05C (Mental Retardation)

The ALJ found that plaintiff's impairments did not meet or equal listed impairment 12.05C.  Listed impairment 12.05C is as follows:

> 12.05 Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental periods; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied . . . .

> ****

> C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Pt. 404, Subpt. P., App. 1 at 479 (2013 at 512).

> In order to satisfy listed impairment 12.05(C), plaintiff must show: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence must demonstrate or support onset of the impairment before age 22 (a.k.a. the "capsule" definition), (2) a valid verbal, performance or full scale IQ of 60-70, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function.

*Spencer v. Colvin*, 2015 U.S. Dist. LEXIS 22444, at **5-6 (D. Kan. Feb. 25, 2015) (citing *Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009)).

Plaintiff has the burden of presenting evidence establishing that his impairment(s) meet or equal a listed impairment.  *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, plaintiff alleges that he has the requisite deficits in adaptive functioning that manifested before age 22 (thereby satisfying the "capsule" definition) as well as a valid perceptual reasoning score[3] of 69, which is within the range needed to meet the requirements of subsection (C).

Acknowledging this requisite IQ score, the ALJ still declined to find that plaintiff met 12.05C, specifically determining that plaintiff did not meet the listing because he did not meet the "capsule" definition.  In other words, plaintiff did not demonstrate the requisite deficits in adaptive functioning that manifested before age 22.

---

[3] The Perceptual Reasoning Index was formerly referred to as Performance IQ.

Plaintiff's medical record is notably silent as to any difficulties before age 22. In fact, the only indication that plaintiff *might* have had difficulty during this time period is his testimony that he did not graduate high school, only completed 11th grade, and was in special education in "the 12th grade and then when I was younger . . . ." Dkt. 11-1, at 57-58. But, there is cause for serious doubt as to plaintiff's testimony.

Dr. Schwartz's report from March 1, 2011, specifically states that plaintiff "is a high school graduate in regular classes with no further education, training, or certificates." Dkt. 11-1, at 520. A previous ALJ opinion, issued on September 23, 2010, noted that plaintiff had at least a high school education. Dkt. 11-1, at 108. Even more telling is plaintiff's own disability report, which he asserted he filled out himself, where he reported that he completed 12th grade on May 17, 1982, and did not attend special education classes. Dkt. 11-1, at 240.

Furthermore, as the ALJ noted, plaintiff has a long work history dating back to 1988. Dkt. 11-1, at 280. This includes twelve years as a factory worker for La Crosse Furniture. The VE testified that plaintiff's work history includes semi-skilled work. Dkt. 11-1, at 63. While plaintiff is correct that the Tenth Circuit has yet to rule, at least in a published opinion, on whether previous performance of semi-skilled work precludes a finding under 12.05C, it has found that an individual who completed 11th grade in regular classes and had a successful work history comprised of both unskilled and semi-skilled work was inconsistent with a finding of mental retardation under 12.05C. *Bland v. Astrue*, 432 Fed. Appx. 719, 723 (10th Cir. Apr. 27, 2011) (unpublished); *see also Lemmons v. Colvin*, 2014 U.S. Dist. LEXIS 130166, at *10 (D. Kan. Sept. 17, 2014) (finding that an individual who graduated from high school, while taking special education classes, and worked at semi-skilled jobs for over ten years did not meet the capsule definition for mental retardation).

In addition to plaintiff's education and work history, the ALJ noted other reasons for why plaintiff did not meet the capsule definition of 12.05C.  First, plaintiff has never been diagnosed with mental retardation.  Rather, both Drs. Schwartz and Suansillppongse diagnosed plaintiff with only "borderline intellectual functioning."  Dkt. 11-1, at 522, 525, 529.  In the Psychiatric Review Technique, Dr. Suansillppongse specifically noted that plaintiff's diagnosis did "not precisely satisfy the diagnostic criteria" of mental retardation.  Dkt. 11-1, at 529.  None of plaintiff's treating mental health professionals ever diagnosed him with *any* intellectual disability, much less mental retardation.  In fact, at plaintiff's most recent appointment at High Plains, Mr. Mindrup specifically noted that plaintiff's memory, attention, and concentration were intact.  Likewise, Dr. Suansillppongse determined that plaintiff was only *moderately* limited by his mental health issues, and that was only in eight of twenty assessed areas.  Dkt. 11-1, at 537-38.  Dr. Suansillppongse also concluded that plaintiff has the capacity for simple work activity. Dkt. 11-1, at 524.

Moreover, plaintiff indicated that he takes care of his twelve-year-old son (who suffers from ADHD), cares for his pets, prepares meals and does some housework, and is capable of managing his own finances and activities of daily living.  Dkt. 11-1, at 30, 267-72.  Plaintiff attributes most of his difficulty in doing such activities to his *physical* pain.  Dkt. 11-1, at 267-72.

This court is aware that a "formal diagnosis of mental retardation is not required to satisfy the listing requirements of 12.05C, and a diagnosis of 'borderline intellectual functioning' under the DSM-IV does not preclude a determination of disability under listing 12.05 for mental retardation."  *Bradley v. Astrue*, 2012 U.S. Dist. LEXIS 166084, at *30 (D. Kan. Nov. 21, 2012). However, nowhere is it *mandated* that a finding under 12.05 be made simply because a claimant

has been diagnosed with borderline intellectual functioning, especially when the objective medical evidence does not support such a finding.

As an additional argument, plaintiff alleges that the ALJ failed to adequately define "deficits in adaptive functioning" before determining that plaintiff did not meet the capsule definition of 12.05.  In 2002, the Commissioner recognized at least four possible definitions of "deficits in adaptive functioning" based on definitions provided by the four major professional organizations dealing with mental retardation.  The Commissioner declined, however, to adopt any *one* specific definition, and rather allowed "use of any of the measurement methods recognized and endorsed by the professional organizations."  67 FR 20018, at 20022.

Relying on this recognition, plaintiff alleges that the ALJ was required to specifically *state* which definition he was using to determine whether plaintiff suffered from deficits in adaptive functioning.  Dkt. 12, at 25-26.  The court disagrees.  While explicit notation of which definition the ALJ was using might have been helpful, it was not required.

Plaintiff points to the unpublished case of *Barnes v. Barnhart*, 116 Fed. Appx. 934, 942-43 (10th Cir. 2004), for the idea that, when the ALJ fails to choose and state a particular definition for "deficits in adaptive functioning," the case must be remanded.  The *Barnes* case, however, is somewhat unique.  First, *Barnes* was initially decided before the Commissioner officially determined that, in addition to the requirements contained in the lettered paragraphs of 12.05, a claimant was also required to satisfy the requirements set forth in the "capsule" definition, namely, the "deficits in adaptive functioning" prior to age 22.  Therefore, the ALJ wrote his opinion without regard to one of the four accepted definitions.

The bigger problem in *Barnes* was that, as the Tenth Circuit stated, even applying some type of *ad hoc* definition to the deficits in adaptive functioning, the claimant clearly manifested

such deficits before age 22.  The claimant presented evidence of a poor academic record (including a failure to graduate high school and placement in special education classes), an inability to live outside a structured family environment (she lived with her mother), a failed marriage, and an inability to remain employed for more than a few weeks. The court therefore remanded the case to the Commissioner and ordered the ALJ to choose one of the four definitions and perform and analysis accordingly.

Nowhere, however, did the court say that the ALJ's decision needed to specifically *state* which definition was chosen; merely that the ALJ needed to *choose* one.

Here, while the ALJ admittedly failed to specifically state which standard he used, it appears he *did* consider the factors and evidence pertaining to adaptive functioning as that term is defined by the DSM-IV, that is, in order to be mentally retarded, an individual must have significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.  As discussed at length, *supra*, there is no evidence that plaintiff had *significant* limitations in *any* of these areas.

Accordingly, plaintiff's first assignment of error fails and is dismissed.

**B.     Plaintiff's Credibility**

Plaintiff next argues that the ALJ improperly discounted his credibility based on limited daily activities.  While it is true that the ALJ specifically mentioned plaintiff's activities of daily living as *part* of his credibility determination, he did not base the *entire* credibility determination on this evidence alone.

Recognizing that "some claimants exaggerate symptoms for the purposes of obtaining government benefits," (*Bolan v. Barnhart*, 212 F. Supp. 2d 1248, 1260 (D. Kan. 2002) (citing

*Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987)), an ALJ's credibility determinations are generally treated as binding on review.  *Talley v. Sullivan*, 908 F.2d 585, 587 (10th Cir. 1990); *Broadbent v. Harris*, 698 F.2d 407, 413 (10th Cir. 1983).  "Credibility determinations are peculiarly the province of the finder of fact" and will not be overturned when supported by substantial evidence.  *Wilson*, 602 F.3d at 1144; *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005).  The court cannot displace the ALJ's choice between two fairly conflicting views even though the court may have justifiably made a different choice.  *Oldham v. Astrue*, 509 F.3d 1254, 1257-58 (10th Cir. 2007).  However, notwithstanding the deference generally given to an ALJ's credibility determination, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."  *Wilson*, 602 F.3d at 1144 (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1998)).

The ALJ noted that plaintiff's complaints, both physical and mental, were inconsistent with the objective medical evidence.  For example, despite plaintiff's allegations of severe lower back pain, the record shows that after his two back surgeries in 2010, he told his treating surgeon that he had done fairly well.  The surgeon concluded that there was no need for any additional surgery but later recommended epidural injections, after which plaintiff reported doing "very, very well."  Dkt. 11-1, at 577.  Consultative examiner Dr. Smith found that plaintiff had normal gait, straight leg raising tests, and strength.

The ALJ also noted that, during an appointment with physicians assistant Dodie L. Martin in April 2012, plaintiff reported going to the wellness center, pitching baseballs to his son, and doing sit-ups.  Dkt. 11-1, at 597.  Ms. Martin suggested that plaintiff continue doing non-weight bearing activities.  Even in his own testimony, plaintiff stated that he could lift twenty pounds, stand for forty-five minutes, walk no more than one mile, sit for about an hour,

and push and pull without restriction.  Dkt. 11-1, at 71-73.  Plaintiff also testified that he could engage in activities such as crouching, crawling, stooping, squatting, bending, kneeling, and getting down on the floor, but would have some difficulty getting back up.  Dkt. 11-1, at 73-74.

With regard to his mental health issues and alleged lack of concentration, plaintiff stated that he attended High Plains "about every couple of months."  Dkt 11-1, at 67.  However, plaintiff's medical records are significantly more sporadic, with appointments in January, April, August, and December 2010, and then not again until May and June 2012.  The ALJ also noted that, while plaintiff testified to having crying spells twice per week, he made no mention of such spells to his mental healthcare providers.  In fact, in January 2010, plaintiff told Mr. Mindrup that he had not been having many crying spells at all.  Furthermore, there are numerous instances in the record where plaintiff admitted that he had gone off his medications for months at a time. The ALJ also noted plaintiff's relatively normal mental status examinations where, as recently as June 2012, plaintiff's memory, attention, and concentration were found to be intact and his mood and affect were good.[4]

As noted above, credibility findings are the province of the ALJ and will be affirmed if supported by substantial evidence.  *Wilson*, 602 F.3d at 1144; *Hackett*, 395 F.3d at 1173. The court finds the ALJ's credibility assessment of plaintiff to be based on substantial evidence. Accordingly, plaintiff's second assignment of error fails and is therefore dismissed.

---

[4] As noted above, there is some inconsistency between plaintiff's testimony as to his education and what is contained in the medical record.  A previous disability determination found that plaintiff graduated from high school.  Both Drs. Schwartz and Smith reported that plaintiff graduated from high school.  In fact, plaintiff himself reported having graduated from high school with regular classes and even gave a very specific date as to his high school graduation.  However, during his testimony, plaintiff indicated that he only completed 11th grade and was in special education classes.  This discrepancy also contributes to plaintiff's credibility.

**C.      Medical Source Opinions**

Finally, plaintiff alleges error with regard to the ALJ's treatment of his treating physicians.  More specifically, plaintiff argues that the ALJ gave substantial weight to the opinions of the state agency consultants while simultaneously discounting and assigning only little weight to the opinion of Dr. Virginia Patriarca and Mr. Mindrup, plaintiff's "own medical treatment providers."  Dkt. 12, at 35.

As a general rule, an ALJ has a duty to evaluate all medical opinions in the claimant's record, to assign weight to each opinion, and to discuss the weight given to the opinion.  *See* 20 C.F.R. §§ 416.927(c), 416.927(e)(2)(ii); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012).  The opinion of a treating physician is generally entitled to controlling weight if it "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence in the record."  *Pisciotta v. Astrue*, 500 F.3d 1074, 1077 (10th Cir. 2007).  In the event that the ALJ decides that "the treating physician's opinion is *not* entitled to controlling weight, the ALJ must then consider whether the opinion should be rejected altogether or assigned some lesser weight."  *Id.* (emphasis added).  Relevant factors the ALJ may consider include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (internal quotations omitted).

"Under the regulations, the agency rulings, and our case law, an ALJ must give good reasons for the weight assigned to a treating physician's opinion."  *Langley v. Barnhart*, 373

F.3d 1116, 1119 (10th Cir. 2004) (ellipsis omitted) (internal quotations omitted); *see also* 20 C.F.R. § 416.927(c)(2).  The reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Langley*, 373 F.3d at 1119 (internal quotations omitted).  "If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so." *Id*. (internal quotations omitted).  If the ALJ fails to explain how he assessed the weight of a treating physician's opinion, a court cannot presume that he actually applied the correct legal standards.  *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) (per curiam).

As stated above, the ALJ assigned the opinion of Dr. Patriarca and Mr. Mindrup little weight.[5]  The medical source statement issued by Dr. Patriarca and Mr. Mindrup on September 19, 2012, stated that plaintiff would be unable to maintain full-time work and would be likely to miss more than four days of work per month.  Dkt. 11-1, at 611.  The ALJ found that this opinion was without support from other evidence in the record, including Mr. Mindrup's own treatment notes.  The medical source statement stated that plaintiff suffered from bouts of significant depression during which he would withdraw and, at times, engage in self-mutilation.  Dkt. 11-1, at 609.  Indeed, during an appointment on May 10, 2012, plaintiff reported that he had allegedly cut on his arm sometime in March 2012 for pain release.  However, in August and September 2010, the immediately prior sessions with Mr. Mindrup, plaintiff reported that he had not done any cutting.

---

[5] It should be noted that Mr. Mindrup is a nurse practitioner, not a physician.  As a general rule, the Commissioner may use evidence from "other medical sources," which includes a nurse practitioner.  *Dixon v. Astrue*, 2011 U.S. Dist. LEXIS 37518, at *10 (D. Kan. Apr. 6, 2011) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)).  However, the Commissioner is not required to give the opinion of a nurse practitioner controlling weight.  Here, it appears that plaintiff never actually saw Dr. Patriarca and was only treated by Mr. Mindrup; Dr. Patriarca merely signed off on Mr. Mindrup's reports.  However, given the wording of his opinion, it appears that the ALJ considered the opinion of Mr. Mindrup as if it was also the opinion of Dr. Patriarca.  Dkt. 11-1, at 32.  This court will therefore do the same.

The medical source statement reported that plaintiff had "marked" restriction of activities of daily living; however, nowhere else in the record is such a significant restriction found. In fact, in plaintiff's own testimony, he stated that he took care of his twelve-year-old son (over whom he had full residential custody), drove (even though his license was suspended for unpaid traffic tickets), cooked, cleaned the house, and went shopping. The statement also noted "frequent" deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. However, in his most recent visits with Mr. Mindrup, in May and June 2012, Mr. Mindrup reported that plaintiff's memory, attention, and concentration were intact. Additionally, Dr. Suansillppongse noted that plaintiff's ability for sustained concentration, persistence, and task concentration were only minimally limited. During administration of the IQ test, Dr. Schwartz noted that plaintiff was adequately motivated and diligent in carrying out tasks and could understand and follow directions.

The ALJ also found little, if any, evidence to support the conclusion that plaintiff had "extreme" difficulties in maintaining social functioning. The ALJ noted that plaintiff was able to leave the house independently, grocery shop, go to the library, and spend time with his son. Additional evidence in the record shows that plaintiff was always cooperative, pleasant, and made good eye contact. While plaintiff stated that he did not like to interact with people, he also admitted that he interacts with a friend who comes over to assist him with caring for his pets.

The ALJ also that the medical source statement assigned plaintiff a GAF score of 54, indicating only *moderate* symptoms.

Based on its review of the record, the court finds that the ALJ's decision with regard to the weight assigned to plaintiff's treating physicians is based on substantial evidence. Although there may be additional evidence in the record to support plaintiff's argument, the court may

"neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]."

*Bowman*, 511 F.3d at 1272 (quoting *Casias*, 933 F.3d at 800).

Accordingly, plaintiff's third assignment of error fails and is therefore dismissed.

**IT IS THEREFORE ORDERED** this 14th day of July, 2015, that the judgment of the

Commissioner is affirmed.


<u>s/J. Thomas Marten</u>
J. THOMAS MARTEN,
CHIEF JUDGE